FILED
2014 Aug-08  PM 02:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GREGORY MORGAN,             }
                           }
    Plaintiff,        }
                           }     CIVIL ACTION NO.
v.                     }     2:13-cv-0257-WMA
                           }
NORFOLK SOUTHERN RAILWAY   }
COMPANY, et al.,       }
                           }
    Defendants.       }

**MEMORANDUM OPINION AND ORDER**

Plaintiff Gregory Morgan brings this action against defendant Norfolk Southern Railway Company ("Norfolk") seeking damages for alleged violations of the anti-retaliation provisions of the Federal Railway Safety Act ("FRSA"), 49 U.S.C. § 20109. Defendant has moved for summary judgment. The motion is fully briefed. For the reasons that follow, the motion will be denied.

**Background**

The FRSA provides that "[a] railroad carrier . . . may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done[,] . . . to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or

1

security." 49 U.S.C. § 20109(a)(2).  The question in this case is whether plaintiff, a railroad employee, was demoted for refusing to fabricate safety violations for the sake of making his safety reports appear more thorough and impressive than justified by the facts.  The parties are in agreement that such a refusal would be a protected activity under the statute, but disagree as to whether such a refusal actually occurred and, if it did, whether it was a contributing cause of the disciplinary action.

Plaintiff explains the events upon which he bases his action as follows: Defendant, a railroad company, desperately wanted to give the appearance that it was improving its safety standards.  It thus instructed its Road Foremen of Engines ("RFEs"), including plaintiff, to find and report more safety violations, along with corresponding corrective action, on the trains they managed. Defendant went so far as to require a strict quota of safety violations to be reported and, in a raging, screaming fit, a supervisor specifically instructed plaintiff that if he was unable to meet the quota, he was to make violations up in order to do so. Plaintiff was unable to find enough violations to satisfy his bosses, and did not want to malign the loyal engineers working under him by writing up errors that they didn't actually commit. He therefore refused to meet defendant's reporting quota. Defendant responded by "transferring" him to a position in a

different state, with a lower rank and lower pay.  Plaintiff chose to resign instead of accepting the transfer.  He claims constructive discharge.

Defendant has an entirely different spin.  Yes, defendant told plaintiff to find more safety violations, but why wouldn't it?  After all, the primary purpose of the RFE position is to uncover safety violations.  Plaintiff reported by far the lowest number of safety violations of any RFE with the company, a fact made more alarming by the fact that, during the time period at issue here, plaintiff's division was suffering a spike in train derailments, with dire risk to the lives and property of employees and the public.  Time and time again, plaintiff attributed these derailment incidents to unavoidable equipment malfunction and the like, though when defendant reviewed incidents with plaintiff, it was always able to find safety violations that plaintiff had overlooked.  Defendant tried everything it could think of to improve plaintiff's performance.  It "encouraged" him, perhaps harshly, but without imposing an actual "quota," to include more safety violations in his regular reports.  It went over specific incident reports with him in painstaking detail.  It scheduled him for two "Performance Improvement Plans" ("PIPs"), which are essentially corrective trainings.  Plaintiff performed poorly in both PIPs, and his performance never improved.  Defendant strongly implies that

plaintiff is the type who simply can't be bothered with paperwork. At last, defendant had no choice but to transfer plaintiff to a position he was better suited for.

**Analysis**

The anti-retaliation provisions of the FRSA are recent additions to the statute, and have never yet been interpreted in this circuit. This court finds persuasive and therefore follows the analysis of the statute employed by the Third Circuit in *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156-57 (3d Cir. 2013). As the Third Circuit explained, "[t]he FRSA incorporates by reference the rules and procedures applicable to Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistleblower cases." *Id.* at 157 (citing 49 U.S.C. § 20109(d)(2)(A)). Under this framework, "an employee must show, by a preponderance of the evidence, that '(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" *Id.* (quoting *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008)). Once the employee does this, "the burden shifts to the employer to demonstrate 'by clear and convincing evidence[] that the employer would have taken the same unfavorable personnel action in the absence of that

4

behavior.'"  *Id.* (quoting 49 U.S.C. § 42121(b)(2)(B)(ii)).

Defendant in this case denies that plaintiff has produced evidence sufficient to satisfy the first and fourth elements of his initial burden, namely, whether plaintiff engaged in protected activity, and whether it was a contributing factor in the unfavorable action.  Defendant also briefly argues that it would have taken the same unfavorable action even if plaintiff had engaged in protected activity.

**A.  Protected Activity**

The parties' dispute over the "protected activity" element is a purely factual dispute, with no legal component.  The parties are in full agreement that fabricating safety violations on a safety report would violate federal safety regulations, and thus that an employee's refusal to fabricate a safety violation would be protected activity under the FRSA.  The only question is whether plaintiff has produced evidence to reflect that defendant did, in fact, instruct plaintiff to make one or more fabrications.  If not, plaintiff had nothing to refuse, and defendant had nothing to retaliate against.

Plaintiff relies primarily on two pieces of evidence to show that defendant instructed him to report safety violations that did not occur.  First, he has produced an April 2010 email sent by Daniel Bostek, plaintiff's supervisor, to all of defendant's RFEs.

The email says:

> Every RFE on this division is expected to report on the
> Tuesday May 4th safety call[] the total number of
> proactive handlings [made.] . . . Each RFE should be
> prepared to discuss not less than six (6) unique
> handlings during the call.  If you are not prepared to
> discuss your handlings on the call, we will discuss them
> in my office on May 5th at 0600am. . . . This activity is
> not optional.

Bostek Email of April 23, 2010 (Pl.'s Ex. "D.17-2" at 11).

The import of this email is open to interpretation.  Plaintiff
makes the argument that the jury can be expected to note that the
email lists an exact number of "handlings" (reports of safety
violations with proper corrective action) that are required, and
that it threatens reprisal if that number is not met.  The jury may
conclude from this that, by strong insinuation, defendant was
instructing plaintiff to fabricate safety violations, i.e., "this
is a strict quota, meet it *by any means necessary*, wink wink."  On
the other hand, from defendant's point of view, the jury should not
be allowed to read a "quota" into an email in which "quota" is not
mentioned.  The email impresses upon the RFEs the importance of
reporting violations, but the "quota" of six reports is not
absolute.  An employee with a really great excuse might offer it to
Bostek during the May 4 telephone call or in the private meeting
the following day.  The email does not advertise any automatic
discipline.  More importantly, the email contains no reference

6

whatsoever to fabrication or falsification of safety reports. Plaintiff, in order to win, would be expecting the jury to make a significant, if not impossible, inferential leap.

Plaintiff's explanation of the email, however, gains greater strength when viewed in the context of his second primary evidence, that is, plaintiff's own deposition testimony of what occurred on May 5, 2010. Just as the email promised, plaintiff had been asked to discuss six proactive handlings during a May 4 conference call and, having failed to find six handlings, had been required to show up in Bostek's office at 6:00 a.m. the next day. Predictably, the conversation was not a pleasant one. As soon as plaintiff walked into the room, he says, "Mr. Bostek started hollering, 'Why did you not get six violations? My boss instructed me to get six violations. No matter how I had to do it, I was to show six violations.'" Morgan Dep. at 64 (Pl.'s Ex. "D.17-1" at 16). Plaintiff says that he tried to explain that there were simply no violations to report, but Bostek continued to yell: "No matter what, if my boss tells me to do something, you are to do it no matter how you are to do it." *Id.* Plaintiff says that he tried to explain that the only way he could report more safety violations would be to make them up. Bostek allegedly responded, "Well, I would do whatever my boss instructed me to do. However I had to do it, I would get it done." *Id.* at 65 (Pl.'s Ex. "D.17-1" at 17).

This May 5 conversation, as described by plaintiff, provides extra punch for the insinuation theory of the May 4 email. The conversation and the email, viewed together, provide sufficient evidence for a jury to conclude that defendant instructed plaintiff to fabricate safety violations. It is undisputed that plaintiff did not make any such fabricated reports. Plaintiff has therefore met his burden, for the purpose of defending summary judgment, of showing that he engaged in a "protected activity" under the FRSA.

This is not to say, of course, that the jury will necessarily agree with plaintiff once all relevant evidence is presented. As defendant rightly points out, plaintiff's own deposition testimony is blatantly self-serving, and the jury may choose not to credit it. Moreover, defendant argues, Bostek's angry comments are much less damning when viewed in full factual context. In April, 2010, at the time of Bostek's email and follow-up oral comments, plaintiff's division was on pace to suffer approximately 72 derailment incidents for the year, an increase of almost 70% from the previous year. *See* RVD Report at 1 (Def.'s Ex. F.A. at 1). Defendant's management was understandably frustrated and chagrined. Defendant says that Bostek's so-called "quota" was spurred by a desperate need to improve train safety, something that Bostek thought would be achieved if the RFE's found and reported more **real** safety violations, not made-up ones. Viewed in light of

8

defendant's apparent safety crisis, the jury may conclude that Bostek's angry "whatever it takes" comments were inspired by justifiable incredulity at plaintiff's claims that he could not find safety violations, rather than that the comments were meant as an order to fabricate violations.  Finally, to the extent relevant, defendant points out that any "quota" obligation apparently had the desired effect.  Derailment incidents tapered off in the second half of the year, with a final count of 49, only about a 14% increase from the previous year.

It is not for the court to weigh the evidence designed to make it more or less likely for the jury to interpret defendant's communications to plaintiff as an instruction to fabricate safety violations.  It is enough at this stage to say that plaintiff has produced sufficient evidence upon which a jury could find that his interpretation is the correct one.  Defendant is therefore not entitled to summary judgment.  Its attack on the reliability and/or significance of plaintiff's evidence will make for an interesting jury trial.

## B.  Causation

The second issue on summary judgment consideration is over whether plaintiff has produced sufficient evidence to carry his burden of showing that "the protected activity was a contributing factor in the unfavorable action."  *Araujo*, 708 F.3d at 157.

Defendant has two arguments on this issue.  First, it points out that plaintiff's participation in the PIP programs was intended to correct not only his failure to report enough safety violations, but also several other shortcomings.  It was his failure to "pass" the PIP trainings, including failure to improve on these other issues, that caused his eventual demotion or transfer.  Defendant says that the court must not second guess its demotion decision in this context because doing so would violate the rule that the court should not act "as a super-personnel department that reexamines an entity's business decisions."  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).  Defendant next argues that the demotion, which occurred in February, 2012, was too far temporally removed from the May 2010 communications for there to be any causal connection between the two.  Defendant points out that a DOL regulation allows an employee to demonstrate causation by showing, "for example, . . . the adverse personnel action took place shortly after the protected activity."  29 CFR § 1979.104(b)(2).  It reasons that an adverse action that does not take place shortly after the protected activity cannot show causation.  It cites a number of Title VII cases for the proposition that an extended time lapse between the protected activity and the adverse employment action is a barrier to proving causation.

Defendants' two arguments both fail for the same reason.  The

FRSA contains, on its face, a lighter causation standard than do other employment retaliation statutes. *Compare, e.g.*, Title VII, 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against [an employee] . . . **because** he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.") (emphasis added), *with* the FRSA, 49 U.S.C. § 20109(a)(2) (Unlawful when the "discrimination **is due, in whole or in part**, to the employee's [protected act].") (emphasis added); *see Araujo*, 708 F.3d at 158 ("Considering the plain meaning of the statute, FRSA burden-shifting is much more protective of plaintiff-employees than the *McDonnell Douglas* framework."). Defendant's reliance on *Elrod*, which dealt with the Age Discrimination in Employment Act, and the several time-bar type cases, which dealt with Title VII, is thus misplaced. The standards developed in those cases are not applicable to this case.

Under the FRSA, a plaintiff need only show that retaliation was a "contributing factor" to the adverse employment decision, "which alone or in combination with other factors, tends to affect in any way the outcome of the decision." *Id.* at 158 (quoting *Ameristar Airways, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 650 F.3d 562, 567 (5th Cir. 2011)). If it is assumed that

defendant did instruct plaintiff to fabricate safety violations, defendant's apparent anger in response to plaintiff's refusal is enough for a jury to find that plaintiff's refusal was a contributing factor to defendant's demotion decision.

Moreover, plaintiff has produced evidence that would satisfy a much less lenient burden. In addition to circumstantial evidence that his protected activity played some part in defendant's decision, plaintiff has presented direct evidence that defendant's motive was retaliatory, to the point of vengefulness. Shortly after the spring 2011 email and conversations, an anonymous RFE sent an email to a company higher-up complaining about the quota, and Bostek received a scolding phone call about it. Plaintiff alleges that Bostek responded by calling plaintiff, along with one other RFE, into his office a second time. His purpose was not to apologize. As plaintiff recounts: "[Bostek] looked at me straight in the eye and said, 'I'm going to fire whoever sent that email.' . . . I said, 'Boss, I didn't send it.' . . . He said, 'I will find out.' He said, 'And they will lose their job. They will no longer be a company officer.'" Morgan Dep. at 73 (Pl.'s Ex. "D.17-1" at 19). As with plaintiff's other deposition testimony, whether the jury will believe this or not is an open question. But if the testimony is believed, it provides adequate evidence upon which the jury can find that plaintiff's refusal to fabricate safety

violations was a contributing factor to defendant's demotion decision.[1]  Indeed, this court ventures to guess that a jury would be persuaded by this testimony, if they believe it, that the demotion was, at least in part, payback for plaintiff's protected refusal to fabricate.

## C.  Other Arguments

Conceding *arguendo* that plaintiff has met all elements of his initial burden, defendant argues that it is still entitled to summary judgment because it has demonstrated "by clear and convincing evidence[] that the employer would have taken the same unfavorable personnel action in the absence of that behavior." *Araujo*, 708 F.3d at 157.  Defendant claims that its standard practice for underperforming employees was to schedule them for PIPs and, if performance did not improve, transfer them to other positions.  It presents evidence that it treated a large number of other employees, none of whom were part of the alleged "quota"

---

[1]This retaliatory behavior is arguably a better fit for 49 U.S.C. § 20109(a)(1)©, another paragraph of the statute, which prohibits retaliation for "provid[ing] information . . . in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation, . . . if the information is provided to . . . a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct." Plaintiff references this paragraph in complaint, *see* Compl. ¶ 29, but the parties focus their summary judgment arguments on the "refusal" language of § 20109(a)(2).

discussions, exactly the same way it treated plaintiff.   From this it argues that its treatment of plaintiff was not affected in any way by any possible refusal to falsify safety reports.

Oddly, defendant pursues its argument that plaintiff was treated the same as other employees by pointing out dissimilarities in his treatment.   No doubt in an effort to emphasize its overall fairness and patience, defendant claims that "Mr. Morgan was the only person given two PIPs [rather than just one,] and the only one who was offered a transfer to another officer position when he did not successfully complete his PIP."   Def.'s Mem. at 36.   However, this dissimilar treatment could be viewed as evidence that defendant was trying to cover its tracks or talk plaintiff out of litigation, and not as evidence of fairness and patience.   Even if not so viewed, it will be up to the jury to determine whether defendant has proven by the higher burden of "clear and convincing evidence" that it would have reached the same decision without any regard whatsoever to plaintiff's refusal to fabricate safety violations.

**CONCLUSION**

For the foregoing reasons, the court concludes that this case contains genuine disputes as to material facts, so that defendant is not entitled to judgment as a matter of law.   Defendant's motion for summary judgment (Doc. 16) is therefore DENIED.

14

Unless the parties notify the court that they have settled the case or made arrangements to engage in alternative dispute resolution, a pretrial conference shall be held, in chambers, on August 22, 2014, at 10:30 a.m.  A court reporter shall be present. The court strongly encourages the parties to mediate.

DONE this 8th day of August, 2014.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE